FILED

**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

### OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: ) | BAP No. NC-13-1168-DJuKi |
| ) | |
| JACQUELINE C. MELCHER, aka ) | Bk. No. 01-53251-ASW |
| Jacqueline Carlin, ) | |
| ) | |
| Debtor. ) | |
| _____) | |
| ) | |
| JOHN W. RICHARDSON, Chapter ) | |
| 7 Trustee, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **M E M O R A N D U M**[1] |
| ) | |
| JACQUELINE C. MELCHER, ) | |
| ) | |
| Appellee. ) | |
| _____) | |

Argued and Submitted on February 20, 2014
at San Francisco, California

Filed - April 11, 2014

Appeal from the United States Bankruptcy Court
for the Northern District of California

Honorable Arthur S. Weissbrodt, Bankruptcy Judge, Presiding

Appearances:     Charles Patrick Maher, Esq. of McKenna Long &
                 Aldridge LLP argued for Appellant, John W.
                 Richardson, Chapter 7 Trustee; Jacqueline C.
                 Melcher, Appellee, argued in pro per.

Before:  DUNN, JURY, and KIRSCHER, Bankruptcy Judges.

_____

[1]     This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8013-1.

Having twice failed to secure a finding that a chapter 7[2] debtor was a "vexatious litigant," and apparently convinced that the bankruptcy court never would make such a finding, the chapter 7 trustee ("Trustee") filed a motion for a determination that a chapter 7 debtor has no standing in a case with an insolvent estate to oppose any action of the Trustee not specifically directed to the debtor. When the bankruptcy court refused to impose a general prefiling review requirement on the debtor, the Trustee appealed. Based on the extreme nature of the debtor's conduct in the chapter 7 case, we VACATE the order denying the Trustee's motion and REMAND the matter to the bankruptcy court for further proceedings necessary to enter an appropriate order to restrain debtor's further abuses.

## I.   FACTUAL BACKGROUND

### A.   Background

Jacqueline C. Melcher ("Jacqueline") filed a chapter 11 petition on June 28, 2001, twelve hours before escrow was to close on the sale of real property on Martha's Vineyard in Massachusetts, referred to as "Stonewall," pursuant to an order of the Superior Court of California, Monterey County. In an unpublished decision ("Melcher I") issued on May 31, 2006, the Panel reversed the bankruptcy court's order confirming Jacqueline's chapter 11 plan, on the basis, inter alia, that the

---

[2]   Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

bankruptcy court's finding that the plan had been proposed in good faith was clearly erroneous. In Melcher I, the Panel repeatedly quoted a statement made by the bankruptcy court during the course of proceedings before it regarding Jacqueline's motivations: "She will only sell Stonewall if she absolutely has to at the end of her life, you know that." The Panel in Melcher I characterized the post-appeal dispute as a "two-party marital property dispute between Jacqueline and [the estate of her deceased former spouse, Terrence Melcher ("Probate Estate")]. That is a matter peculiarly within the competence of nonbankruptcy courts to resolve."

Melcher I was affirmed by the Ninth Circuit on April 30, 2008, with the admonition that it was time to bring Jacqueline's abuse of the bankruptcy process to an end:

> On appeal, the Bankruptcy Appellate Panel has found that Jacqueline did not file the Plan in good faith but to keep Stonewall from being sold.
>
> It is time to bring this abuse of the bankruptcy process to an end. We affirm the judgment of the BAP.

Melcher v. Estate of Terrence P. Melcher (In re Melcher), Slip Op. Case. No. 06-16412 (9th Cir. April 30, 2008) at 3:8-11.

Two days after the Ninth Circuit affirmed Melcher I, the Probate Estate filed a motion to convert Jacqueline's case to chapter 7 rather than to dismiss it, for the reason that "[a] chapter 7 trustee will be able to expeditiously sell [Stonewall]." Although the bankruptcy court entered an order ("Conversion Order") on June 19, 2008, converting the case to chapter 7, the Conversion Order was not to be effective until July 28, 2008, to allow Jacqueline to file a motion to dismiss

-3-

the case, which the Conversion Order dictated "shall be set for a hearing prior to July 28, 2008."[3]

On July 23, 2008, Jacqueline filed an emergency motion ("Emergency Motion"), which requested that the bankruptcy court either vacate the Conversion Order or postpone the conversion of the case. The Emergency Motion also requested that the bankruptcy court approve a loan that was represented to be in an amount sufficient to pay off all administrative claims and then dismiss the case after the administrative claims had been paid.[4]

The Probate Estate opposed the Emergency Motion on the basis that, because Jacqueline's proposed loan was to be cross-collateralized against Stonewall, it would "eat[] up any equity" Jacqueline might have in Stonewall, thereby greatly impairing the Probate Estate's interest in Stonewall. The Probate Estate further asserted that the proposed loan would not serve its stated purpose of paying all administrative creditors.

Over the objection of the Probate Estate, the bankruptcy court extended the conversion date to August 25, 2008, and required Jacqueline to file a full status report regarding the impact of the financing on Stonewall. The conversion date was

---

[3] The bankruptcy case docket reflects that dismissal of the case was opposed not only by the Probate Estate, but also by the lender on Stonewall and by at least one of the chapter 11 professionals whose fees in excess of $550,000 remained unpaid.

[4] Notwithstanding Jacqueline's desire to be done with the bankruptcy case, the Emergency Motion requested that the bankruptcy court retain jurisdiction after dismissal of the case to allow her to litigate alleged violations of the automatic stay.

-4-

further extended to September 15, 2008, to give Jacqueline an opportunity to seek financing to prevent conversion of the case to chapter 7.

Ultimately, Jacqueline's bankruptcy case was converted to chapter 7 on September 15, 2008, and John Richardson was appointed as Trustee in the case.[5]

Several times during his tenure in the case, the Trustee requested that Jacqueline be adjudicated a "vexatious litigant" and/or that limitations be imposed upon her seemingly endless filings. In the appeal now pending before this Panel, the Trustee included in his excerpts of record a copy of the docket from the date of his appointment to April 15, 2013. This portion of the docket is 108 pages long, contains more than 1700 entries, and reflects the great difficulty Jacqueline had understanding the role of the Trustee and her duties as a debtor in chapter 7. Jacqueline opposed most substantive actions of the Trustee to liquidate estate property.

We are asked to review the bankruptcy court's exercise of its discretion in allowing Jacqueline's abusive use of the bankruptcy process to further her continued efforts to stop the sale of Stonewall by opposing any attempt by the Trustee to

---

[5] When it became apparent that Jacqueline would be unable to meet the court's condition to avoid conversion of the case to chapter 7, on September 12, 2008, Jacqueline's son, Ryan Melcher, filed a Notice of Appeal from the Conversion Order, through which he requested a stay of the conversion. On September 23, 2008, this Panel issue a Notice of Deficient Appeal and Impending Dismissal ("NOD"), because Ryan's appeal (BAP No. NC-08-1235) appeared untimely. After Ryan failed to respond to the NOD, the appeal was dismissed on November 24, 2008.

administer the bankruptcy estate.

B. The Trustee Attempts to Sell the Estate's Martha's Vineyard Properties

    1. The Rooney Application

October 10, 2008, the Trustee applied ("Rooney Application") for an order authorizing him to employ Richard Rooney and Rooney & Company of Martha's Vineyard, Inc. as the real estate broker he intended to use to sell Stonewall, an act he deemed necessary. The Rooney Application also sought conditional approval to employ Mr. Rooney to market and sell another Martha's Vineyard property "Moshup Trail," also with a 5% commission, in the event the Trustee concluded a sale of Moshup Trail was necessary.

The Rooney Application reflected that Mr. Rooney previously had undertaken extensive efforts to market Stonewall during the pendency of the chapter 11 case until Jacqueline "became disenchanted" with Mr. Rooney and his firm in early 2008. The Trustee inspected Stonewall, met with Mr. Rooney, and toured comparable properties, after which he concluded Jacqueline's concerns about Mr. Rooney were not well founded. The Trustee asserted that the listing agreement Jacqueline, as debtor-in-possession, had negotiated with Rooney & Company contained a provision that allowed Rooney & Company a 2% commission even if Stonewall were sold by another broker. In part to resolve this potential liability of the estate, the Trustee proposed a 5% commission for Mr. Rooney, subject to division with any buyer's broker.

Jacqueline vigorously opposed the Rooney Application. Her objection filed on October 22, 2008, was supported by two

-6-

declarations by her former chapter 11 counsel. After the Trustee filed a responsive declaration from Mr. Rooney, Jacqueline filed a further declaration to respond to what she characterized as Mr. Rooney's "false statements."

The dispute over the employment of Mr. Rooney was the subject of numerous additional declarations, objections, and hearings. It appears that the bankruptcy court, with the agreement of the Trustee, allowed Jacqueline a limited opportunity to "market" Stonewall by advertising in a high-end magazine. When the time period allowed was over and the continued hearing on the Rooney Application was held, it became evident to the bankruptcy court that Jacqueline had done nothing even to investigate how to place an advertisement in the magazine. In an apparent attempt to circumvent further needless objections regarding who ultimately was hired to market Stonewall, the bankruptcy court precluded the Trustee from employing Mr. Rooney. Instead, the Trustee was directed to propose three alternative brokers, with Jacqueline to have the final say as to which broker was to be employed. An order authorizing the employment of Martha's Vineyard Seacoast Properties to market Stonewall was entered on March 19, 2009.

Notwithstanding Jacqueline's objection to Mr. Rooney generally, the bankruptcy court authorized his employment to market the Moshup Trail property. The order authorizing Mr. Rooney's employment to market Moshup Trail was entered on March 16, 2009.

Jacqueline immediately filed a motion seeking "clarification" and a restraining order or stay of the

-7-

implementation of both employment orders. By its order entered March 24, 2009, the bankruptcy court construed this motion as a motion to reconsider the employment orders and denied the request. On April 10, 2009, Jacqueline filed a further request for a restraining order to prevent Mr. Rooney from listing Moshup Trail "and randomly picking a selling price about which he has no knowledge." The bankruptcy court held a further hearing April 24, 2009, on Jacqueline's continuing objections to the employment orders and entered yet another order denying reconsideration on May 8, 2009.[6]

Jacqueline filed a timely appeal from the May 8, 2009 order. However, on March 12, 2010, the District Court for the Northern District of California ("District Court")[7] dismissed the appeal for lack of prosecution after due notice, because Jacqueline neither took any action in the appeal nor responded to the District Court's show cause order. Thereafter, on April 30, 2010, the District Court denied a request from Jacqueline seeking relief from the dismissal of the appeal.

 2. Trustee's Proposed Abandonment of Personal Property at Stonewall

On May 5, 2009, the Trustee noticed his intent to abandon to Jacqueline the furnishings at Stonewall. His decision to abandon

---

[6] It appears that Jacqueline also had filed an "objection" to the form of the proposed employment orders on May 4, 2009, by filing a copy of the proposed order with interlineations.

[7] The Trustee opted out of the Panel's jurisdiction for Jacqueline's appeal from the employment orders.

the furnishings was based primarily on the broker's recommendation that Stonewall would show better if it were empty. The Trustee estimated the value of the furnishings at not more than $5,000. In light of issues that Jacqueline might raise relating to claims of exemption in the furnishings, the Trustee determined that the furnishings were of inconsequential value to the estate. Jacqueline opposed the abandonment. First, she disagreed that the house would show better without the furnishings. Second, she complained of the expense she would incur to move and store the furnishings. A hearing was held on the dispute on July 1, 2009. On August 20, 2009, the bankruptcy court entered an order confirming the abandonment and providing that Jacqueline had five days to inform the Trustee how she wanted removal of the furniture handled. On the proposed order submitted by the Trustee, the bankruptcy court interlineated that he had reviewed Jacqueline's objections to the form of the order, but that its terms were consistent with what the bankruptcy court had decided at the July 1, 2009 hearing.

   3.   Trustee's Proposed Sale of Moshup Trail

On May 22, 2009, the Trustee proposed to sell Moshup Trail for $3.6 million cash. The prospective buyer insisted on closing the sale by July 15, 2009. The notice of the proposed sale called for overbids in the minimum amount of $100,000 and provided a "break up fee" to the prospective buyer in the amount of $20,000 in the event the Trustee accepted a higher offer. Jacqueline objected to the proposed sale on numerous grounds. She challenged the efforts of the Trustee and Mr. Rooney to market Moshup Trail as minimal, asserted that the value was too

low, and emphasized (through her final paragraph typed in all capital letters) that the only reason the trustee was selling Moshup Trail was based on his incorrect belief that the Probate Estate was owed millions. The Trustee responded and provided a declaration from the prospective buyer. Following a hearing at which evidence was taken, the bankruptcy court approved the sale. In the order approving the sale, the bankruptcy court interlineated that it had considered and rejected Jacqueline's objections to the proposed form of the order. The order also stated that the bankruptcy court did not review or consider the untimely objection to the proposed sale that Jacqueline's son, Ryan, had filed. Jacqueline filed a Notice of Appeal and a motion for stay pending appeal. When the bankruptcy court denied the stay pending appeal, Jacqueline appealed that order as well. The Trustee also elected to have these appeals heard by the District Court. Both appeals were dismissed on March 12, 2010, for lack of prosecution.

    4.   <u>Trustee's Proposed Abandonment of Personal Property at Moshup Trail</u>

A requirement of the Moshup Trail sale was that the Trustee was to remove all personal property from Moshup Trail and leave the real property "broom clean." The Trustee therefore moved the property, which was property of the estate in which Jacqueline claimed "questionable" exemptions, to storage, which the Trustee prepaid through September 30, 2009.

On July 14, 2009, the day before the closing date for the sale of Moshup Trail, Jacqueline filed a request for an emergency hearing on the removal of "her possessions" from Moshup Trail.

-10-

In her emergency motion Jacqueline stated that a neighbor had called her, "shocked" that Jacqueline's things were being moved out. Jacqueline contested the Trustee's right to have moved the property. Jacqueline asserted that because she had no clue why anyone was touching "her" things, she had called the police.

After escrow on the Moshup Trail sale closed, the Trustee, on July 22, 2009, served notice of his intent to abandon the personal property removed from Moshup Trail because it was of inconsequential value to the estate. Jacqueline opposed this as well, complaining that she should have been allowed to remove the personal property herself, because she could have done so at less expense than the Trustee incurred in packing and removing the personal property, an expense which the Trustee was seeking to recover from Jacqueline.

A hearing on Jacqueline's objections to the proposed abandonment was held on August 31, 2009, and on September 18, 2009, the bankruptcy court entered an order overruling those objections. The order confirmed the abandonment and authorized the Trustee to pay an additional month's storage from funds of the bankruptcy estate.

C. Jacqueline Attempts to Wrest Control of the Case From the Trustee

Unhappy with the Trustee's initiation of efforts to sell the Martha's Vineyard properties, including Stonewall, Jacqueline did not limit herself to opposing the Trustee's pleadings. In the spirit of making a good defense against the Trustee, Jacqueline undertook a strong offense.

On December 12, 2008, while the Rooney Application was

-11-

pending, Jacqueline filed a motion to compel ("Motion to Compel") the Trustee to rent the Martha's Vineyard properties. The Motion to Compel elicited from the Trustee not only an objection, but also a motion to surcharge Jacqueline's homestead exemption and a motion to compel her compliance with her duties as a debtor, inter alia, to cooperate with the Trustee.[8]

Jacqueline responded with two motions to remove or to replace the Trustee ("Trustee Removal Motions"). The Trustee then filed a notice of intent to request an order requiring that Jacqueline satisfy excess expenses, attorneys fees, and costs the estate was incurring as a result of the volume of her pleadings, which were interfering with the Trustee's administration of the estate.

The bankruptcy court held a hearing on January 27, 2009, at

---

[8] The Trustee sought compliance with §§ 521(a)(3) and (4), which provide:

(a) The debtor shall:

. . .

(3) if a trustee is serving in the case . . ., cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties under this title;

(4) if a trustee is serving in the case . . ., surrender to the trustee all property of the estate and any recorded information, including books, documents, records, and papers, relating to property of the estate, whether or not immunity is granted under section 344 of this title. . . .

-12-

which time the Motion to Compel was denied.[9]  Not satisfied with the result, Jacqueline filed a motion for reconsideration on February 17, 2009, which the Trustee opposed.  On March 16, 2009, the bankruptcy court denied the motion for reconsideration.[10]

Jacqueline filed a notice of appeal on April 10, 2009.  The District Court[11] dismissed the appeal as untimely.

Also at the January 27, 2009 hearing, the bankruptcy court denied both Trustee Removal Motions.  The bankruptcy court's order denying the Trustee Removal Motions was entered on February 6, 2009.  This order also was the subject of a motion for reconsideration, which in turn, was the subject of an appeal.

D.    Requests to Declare Jacqueline a Vexatious Litigant

The above are but some of the examples of Jacqueline's litigation tenacity as reflected on the docket.  The Trustee was unsuccessful in obtaining Jacqueline's cooperation, notwithstanding the suggestions made through his pleadings that her interference with the administration of the estate was resulting in escalating costs to the estate, and that he would seek to recover from her sanctions in the form of payment for those increased costs.  Ultimately, the Trustee attempted to get the assistance of the bankruptcy court in dealing with the

---

[9]    The bankruptcy court's order denying the Motion to Compel was entered on February 6, 2009.

[10]    The bankruptcy court's order denying the motion for reconsideration was entered March 30, 2009.

[11]    The Trustee opted out of the jurisdiction of this Panel.  Jacqueline also objected to the Trustee's election to have the appeal heard by the District Court.

-13-

overwhelming litigiousness he confronted in response to every action he proposed in the case.

On April 24, 2009, the Trustee file his first "Notice and Motion for Vexatious Litigant Order" ("First Vexatious Litigant Motion"). In it, he asserted that as of the date of the motion, he had not proposed a "single sale or compromise for Court approval" since his appointment. Yet in a four-month period, Jacqueline had filed "33 requests, motions, and oppositions to administrative and other acts deliberately interfering with the Trustee's administration of the case." The bankruptcy court heard the motion, and on July 16, 2009, made detailed findings on the record. Acknowledging that the debtor's filings demonstrated litigiousness, the bankruptcy court ruled that the filings "are not patently without merit such that this Court should determine [Jacqueline] to be a vexatious litigant." The bankruptcy court found that those of Jacqueline's filings that "arguably lacked merit" had decreased since the Trustee filed this motion. The bankruptcy court also determined that it had not been demonstrated that the bankruptcy estate was insolvent, so that it appeared that Jacqueline's excessive pleadings were not taking funds from the creditors in the case.

On September 15, 2010, the Trustee "renewed" his motion seeking a declaration that Jacqueline was a vexatious litigant ("Second Vexatious Litigant Motion"), asserting that her pleadings were increasingly frivolous and untruthful and were designed to damage the estate. The Trustee asserted that since the First Vexatious Litigant Motion was filed, Jacqueline had filed at least 36 vexatious pleadings. The hearing on the Second

-14-

Vexatious Litigant Motion originally was scheduled for October 26, 2010, but was rescheduled to December 3, 2010. The docket contains no other references to the Second Vexatious Litigant Motion until March 15, 2011, when Jacqueline filed an objection to it. However, on April 22, 2011, the bankruptcy court entered an order which recites that at the March 2, 2011 hearing on Jacqueline's objection to the Trustee's proposed settlement with the Probate Estate, the Second Vexatious Litigant Motion was discussed and tentatively scheduled to be heard on April 27, 2011. That order further states:

> . . . the Court requires Trustee and the Probate Estate to calculate for the Court – assuming that the net proceeds were distributed prior to the tax liability being paid out of the net sale proceeds – the amount that Terrence Melcher would have actually received from a sale of [Stonewall] as of December 4, 2001, less any capital gains taxes that would have needed to be paid. Trustee and the Probate Estate shall provide the requested information in writing to the Court on or before May 4, 2011. If the requested information is provided by May 4, 2011, then a continued hearing on the Compromise Motion and the [Second] Vexatious Litigant Motion will be held on May 11, 2011 at 2:30 p.m.

Although in a pleading filed March 29, 2011, the Trustee did provide an analysis of the "adequate protection"[12] payment that was in dispute and formed part of a proposed compromise with the Probate Estate, the analysis did not specifically address the capital gains taxes that would have needed to be paid other than

---

[12] The Probate Estate's right to an "adequate protection" payment was included in the bankruptcy court's order entered early in the chapter 11 case that denied the Probate Estate's request for relief from the automatic stay to enforce its rights in Stonewall.

to state: "In the context of a relief from stay motion I am not aware of a court distinguishing between principal and interest accruals or penalties because the latter are theoretically taxable, and then reducing the amount of adequate protection to account for theoretical tax." The Probate Estate filed a declaration relating to the potential capital gains treatment of a 2001 sale of Stonewall on May 4, 2011.

At the May 11, 2011, hearing, the bankruptcy court again declined to find that Jacqueline was a vexatious litigant with respect to filings made in the bankruptcy case, because, notwithstanding the excessive pleadings, some had been partially responsible for increasing settlements to the estate. Further, the bankruptcy court was not able to determine until Stonewall sold whether the estate would in fact be insolvent.

The bankruptcy court did, however, determine that Jacqueline was barred from filing pleadings in other courts.[13] The bankruptcy court clarified on the record that after the case was converted to chapter 7, Jacqueline had no authority to act in any pending case. The bankruptcy court's order on the Second Vexatious Litigant Motion incorporating this limited prohibition on Jacqueline was entered May 23, 2011. Jacqueline thereafter filed a motion for reconsideration on June 2, 2011, which was

---

[13]    More than two years after the Trustee's appointment Jacqueline still was filing pleadings in litigation she had initiated. This included litigation in Massachusetts against neighboring property owners in which she alleged that their construction had impaired the value of Stonewall. The Trustee Removal Motions reflect that Jacqueline believed that the Trustee was conspiring with the neighboring property owners and the Probate Estate to deprive her of her interest in Stonewall.

initially set to be heard June 23, 2011, but was reset first to July 14, 2011, then to September 13, 2011, and yet again to October 21, 2011,[14] when the hearing finally was held and the bankruptcy court denied the motion. The order denying the motion for reconsideration was entered October 31, 2011.

Between the filing of the First Vexatious Litigant Motion and the order denying Jacqueline's motion for reconsideration of the order partially granting the Second Vexatious Litigant Motion, Jacqueline's pleadings increased dramatically. Not coincidentally, during that period, the Trustee had undertaken to resolve the dispute with the Probate Estate and was actively attempting to sell Stonewall.

On October 11, 2011, days before the ultimate hearing on the Second Vexatious Litigant Motion, Jacqueline filed a motion for an order to show cause why the Trustee should not be held in contempt for failing to turn over documents to her relating to her ongoing objections to many matters decided previously. In its Memorandum Decision of February 6, 2012, the bankruptcy court denied this motion. Jacqueline's (inevitable) motion for reconsideration was denied March 12, 2012. Additionally, two days after the entry of the February 6 Memorandum Decision, Jacqueline filed a request that the Department of Justice investigate the administration of the estate. She also filed a new motion asserting claims against the Trustee on February 7, 2012.

---

[14] Jacqueline filed a new motion for reconsideration on September 30, 2011.

On November 16, 2012, the Trustee served notice of his intent to conduct an auction for the sale of Stonewall by sealed bid, with the minimum bid amount to be $6 million. This triggered yet another flurry of renewed motions from Jacqueline directed against the Trustee. Jacqueline filed another motion to remove the Trustee and his attorney on November 21, 2012. The bankruptcy court attempted to preempt further action on this motion. The bankruptcy court reviewed the motion and its supporting exhibits, determined that oral argument was not necessary, and denied the motion, albeit without prejudice, giving Jacqueline direction as to the specificity and evidence required in the event the motion was refiled. Jacqueline thereafter, on December 12, 2012, filed an amended motion to remove the Trustee without adhering to the instructions of the bankruptcy court. She filed subsequent (redundant) motions to remove the Trustee on January 11, 2013, and on January 17, 2013. When the bankruptcy court denied the first of these three motions on February 6, 2013, Jacqueline promptly filed a motion for reconsideration on February 19, 2013, which was denied by order entered March 13, 2013.

During this series of proceedings, the Trustee filed the motion ("Standing Motion") that is the subject of this appeal, which requested that the bankruptcy court determine that Jacqueline had no standing. The First and Second Vexatious Litigant Motions had been denied primarily because the Trustee did not establish that the bankruptcy estate was insolvent, but also because the bankruptcy court found that Jacqueline's pleadings were neither frivolous nor filed to harass the Trustee

-18-

(First Vexatious Litigant Motion) or were not patently without merit (Second Vexatious Litigant Motion). The Standing Motion did not seek a determination that Jacqueline was a vexatious litigant. Instead, it asserted as grounds to bar Jacqueline's subsequent filings in the case "the insolvency of the bankruptcy estate at the Chapter 11 level and the impossibility of a surplus even if the Court were to order that the Trustee and his counsel return all fees and expenses paid to them since the beginning of the Chapter 7 case."[15] The Trustee's exasperation with both Jacqueline and the bankruptcy court is fully expressed in the Standing Motion.

> From the date on which [Jacqueline] filed her Chapter 11 petition through the date of the present motion, [she] has steadily depleted her bankruptcy estate by (1) incurring during the Chapter 11 case $3.5 million in professional expenses, borrowing approximately the same sum secured by equity in real estate, and selling [a rental property], and (2) filing possibly 1,000 pleadings or more during the Chapter 7 case, challenging the Trustee in almost every aspect of his administration of the bankruptcy estate.

> The enormous financial obligations [Jacqueline] incurred before conversion of the Chapter 11 case could not have been prevented by the Trustee. However, it fell to the Trustee to pay approximately $800,000 in Chapter 11 professional fees and to resolve 11 pending pieces of litigation.

> The Trustee intended, and has consistently attempted, to administer the estate in a manner that was consistent with the requirements of the Bankruptcy Code with the goal of producing a surplus for

---

[15] There are suggestions in the record that the bankruptcy court was displeased by the level of fees generated by the Trustee and his professionals and that denial of further fees and even disgorgement of previously awarded fees had been raised, at least in one instance, when the bankruptcy court expressed frustration that Jacqueline could go from a multi-millionaire to homeless by the end of the case.

[Jacqueline]. However, [Jacqueline] disrupted that plan from the outset of the Chapter 7 case by interfering with the Trustee at every step and requiring the Trustee to devote substantial attorney time and effort to protecting the bankruptcy estate from her. The Court gave [Jacqueline's] views such deference that it appeared that she had standing equal, and in some instances superior, to the Trustee. This made the situation much worse. In this Chapter 7 case, [Jacqueline] somehow has been able to get an "emergency" hearing the same day with no supporting pleadings and no notice to the Trustee (e.g. February 25, 2009, March 25, 2011).

The Trustee warned [Jacqueline] in writing one day after the case converted not to create unnecessary expense. The Trustee made the same warning public in pleadings filed in the first months of the Chapter 7 case and continually throughout the case. No one heeded the warning and now [Jacqueline] and the Court are complaining that [Jacqueline] will not be able to retain "her" house. The Trustee and his counsel (who together have 50 years of experience in bankruptcy liquidations) should have been permitted to run the case without interference from a debtor whose entire Chapter 11 case was a failure and whose stewardship of the estate produced $3.6 million in Chapter 11 professional fees.

Standing Motion at 4:12-5:10. The bankruptcy court heard the Standing Motion on March 19, 2013.

The bankruptcy court denied the Standing Motion because the Trustee had cited no authority to support a blanket ban on filing pleadings in the absence of a finding that a person is a vexatious litigant. The bankruptcy court did provide that the Trustee could raise the standing issue against any individual pleading Jacqueline might file. The bankruptcy court bolstered its decision on its failure to find any case that said a debtor had no standing in the debtor's underlying bankruptcy case when the estate is insolvent.

The Trustee filed a timely notice of appeal from the order denying the Standing Motion, asserting that the Bankruptcy Court

-20-

clearly erred when it refused to determine that where there was no possibility of a surplus and Jacqueline had no possible pecuniary interest, she had no standing to assert any objection except in response to a motion specifically filed against her or a complaint which named her as a defendant.

## II.   JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (O).  We have jurisdiction under 28 U.S.C. § 158

## III.   ISSUE

Whether the bankruptcy court abused its discretion when it denied the Standing Motion.

## IV.   STANDARDS OF REVIEW

In seeking a bar to filing against Jacqueline, the Trustee in effect was seeking sanctions against her.  We review for an abuse of discretion a bankruptcy court's decision regarding requested sanctions.  See, e.g., In re Brooks-Hamilton, 400 B.R. 238, 245 (9th Cir. BAP 2009)(decision to impose Rule 9011 sanctions).  A bankruptcy court abuses its discretion if it applied the wrong legal standard or its findings are illogical, implausible or without support in the record.  TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011).  In the absence of complete findings, we may vacate a judgment and remand to the bankruptcy court to make the required findings.  See United States v. Ameline, 409 F.3d 1073, 1078-81 (9th Cir. 2005).

## V.   DISCUSSION

28 U.S.C. § 1651(a), commonly known as the "All Writs Act," authorizes federal courts to "issue all writs necessary or

-21-

appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." By its terms, the All Writs Act applies to Article I courts, i.e. "Courts established by Act of Congress." Therefore, the All Writs Act is available as an aid to bankruptcy courts in the exercise of their jurisdiction.

The Ninth Circuit long has recognized the ability of trial courts to utilize the All Writs Act to regulate the activities of abusive litigants.[16] See Clinton v. U.S., 297 F.2d 899 (9th Cir.), cert. denied, 369 U.S. 856 (1961); DeLong v. Hennessey, 912 F.2d 1144, 1146 (9th Cir. 1990). This regulation typically takes the form of a "prefiling order." Weissman v. Quail Lodge, Inc., 179 F.3d 1194, 1197 (9th Cir. 1999).

We recognize that a prefiling order is an extreme remedy to be imposed only under extreme circumstances. DeLong, 912 F.2d at 1147. The test to determine whether the imposition of a prefiling order is appropriate against a particular litigant is well-defined. First, the litigant must be provided notice and an opportunity for hearing; second, an adequate record must be made listing the abusive activities undertaken by the litigant; third, the claims brought were frivolous or were brought with the intent to harass the parties; fourth, any order imposed must be tailored narrowly to deter the specific behavior in which the litigant has

---

[16] At least one court has recognized that a court has a "clear duty to take the necessary actions to regulate [an abusive litigant's] access to the court for the good of the parties and court alike." Armstrong v. Rushton (In re Armstrong), 309 B.R. 799, 805 (10th Cir. BAP 2004).

-22-

engaged. Id., 912 F.2d at 1147-48.

In its evaluation of the third and fourth elements of this test, the Ninth Circuit directs the trial court to consider five factors, referred to as the Safir factors, adopted from the Second Circuit's decision in Safir v. U.S. Lines, Inc., 792 F.2d 19 (2d Cir. 1986). See Molski v. Evergreen Dynasty Corp., 500 F.3d 1047, 1058 (9th Cir. 2007).

The Safir factors are:

(1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, e.g. does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties.

Safir, 792 F.2d at 24.

The Trustee twice sought prefiling restrictions against Jacqueline through his motions to have her determined to be a vexatious litigant. In filing the Standing Motion, the Trustee believed it would be useless to request the bankruptcy court to declare Jacqueline a vexatious litigant, where the bankruptcy court twice had recognized the "litigiousness" of Jacqueline's pleadings but would not ascribe an improper motive to their filing. The bankruptcy court had found Jacqueline's voluminous filings were merely "heartfelt."[17] Because motive is to be

---

[17] It also is clear that whatever motion the Trustee filed to obtain the bankruptcy court's assistance in curtailing Jacqueline's filings, resolution of the motion could take months. continue...

-23-

evaluated on an objective basis, this finding was clearly erroneous.

In the light of this record, we read the Standing Motion to include two distinct requests for relief. The first was a declaration that Jacqueline had no standing to be heard on matters of administration in the chapter 7 case that were not directed to her personally because the bankruptcy estate was insolvent. The second was that the bankruptcy court impose a prefiling ban on Jacqueline to prevent further erosion of the estate from her litigiousness.

The bankruptcy court denied the Standing Motion, stating "The problem is, the Trustee has not cited any authority, not one single case, and the Court is not aware of any for a blanket ban on filing pleadings <u>in the absence of a finding that a person is a vexatious litigant</u>." Although the Standing Motion raised the issue of the litigiousness of Jacqueline as a basis for seeking a prefiling ban, thereby implicitly invoking the All Writs Act, the bankruptcy court made no findings to support a denial of that relief.

This appeal turns on the issue of whether the bankruptcy court abused its discretion in refusing to impose prefiling restrictions on Jacqueline.

The hearing on the Standing Motion satisfies the first element of the <u>DeLong</u> test, i.e., that Jacqueline be provided notice and an opportunity for hearing on the issue that a

---

[17]...continue
We cannot fault the Trustee for attempting to obtain a prefiling order against Jacqueline through his standing argument.

prefiling bar might be imposed against her. The Standing Motion and Mr. Maher's declaration in support of it satisfy the second element of the DeLong test, providing a more than adequate record of the abusive activities Jacqueline had undertaken over a lengthy period of time.

The third element of the DeLong test is at the heart of this appeal, as well as of the Trustee's frustration. Jacqueline's multiple pleadings were frivolous and were brought with the intent to harass the parties. The bankruptcy court never made this finding in any of the three motions filed by the Trustee, and in light of the bankruptcy court's comments that Jacqueline's litigation tactics were merely "heartfelt," we doubt the bankruptcy court ever would. However, in applying the third element in DeLong, the bankruptcy court failed to follow the Ninth Circuit's directive to consider the Safir factors. In this matter, two cry out to be highlighted: (1) Jacqueline's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits, and (2) Jacqueline's motive in pursuing the litigation.

In the context of the Trustee's quest for a prefiling bar against Jacqueline, these factors were no longer subject to any dispute. In Melcher I, this Panel was so struck by inconsistency between the bankruptcy court's determination that Jacqueline's plan as it addressed the treatment of the Probate Estate was proposed in good faith and the bankruptcy court's statement, "She will only sell Stonewall if she absolutely has to at the end of her life, you know that," that it repeated the statement multiple times. The Ninth Circuit named Jacqueline's motivation in the

-25-

bankruptcy case for what it was - an abusive use of the bankruptcy process.[18]

Two other Safir factors merit discussion here as well. First, the record establishes beyond any question that estate assets have been all but used up as a result of Jacqueline's continued meritless litigation. The twelve appeals she filed but did not prosecute are but a small example in the context of this case. There is no question from the record before us that the Probate Estate has been impacted seriously by the diminution of the bankruptcy estate, as have the Trustee and his counsel in light of the fees and expenses they have incurred in attempting to meet their statutory duties to administer the bankruptcy estate. The bankruptcy court itself expressed concern that as a consequence of the protracted proceedings, Jacqueline was likely

---

[18] In Melcher I, we previously rejected the bankruptcy court's generous characterization of Jacqueline's litigation tactics:

The [bankruptcy] court grounded its reason . . . on the proposition that Jacqueline "merely seeks to complete the California State Court litigation and receive a determination of the parties' respective legal rights." 329 B.R. at 876. The seemingly innocuous nature of the debtor's purpose implied by that statement is belied by her litigation history from 1997 through the time of confirmation and continues to be belied by her litigation activity, especially her initiation of the Los Angeles County Superior Court action, following confirmation.

Melcher I at 14:21-15:1. "Jacqueline's litigation history warrants a prediction that any motion for relief from stay would be litigated to the maximum extent possible and that all possible appeals would be pursued. . . ." Id. at 16:14-17.

-26-

to be transformed from a financially independent woman with millions of dollars in assets to an individual rendered homeless through the bankruptcy process, a result all concede is untenable, but now increasingly likely.

Second, it is evident that no sanction short of a prefiling bar will curtail Jacqueline's actions. Consider the series of pleadings that led directly to the filing of the Standing Motion. When Jacqueline filed one of her motions to remove the Trustee and his attorney on November 21, 2012, the bankruptcy court reviewed the motion and its supporting exhibits, determined that oral argument was not necessary, and denied the motion, giving Jacqueline explicit directions as to the specificity and evidence required in the event she elected to refile the motion. Jacqueline ignored the instructions of the bankruptcy court and filed not one, but three additional redundant motions without compliance, as well as a further motion for reconsideration on their denial.

The fifth Safir factor also is important in this case in light of the Supreme Court's recent determination that a chapter 7 debtor's exemptions are fully protected from surcharge. Law v. Siegel, 134 S.Ct. 1188 (2014). Jacqueline ignored with impunity the Trustee's continuous pleas that she scale back her litigation assaults or face the possible consequence of a surcharge to her homestead exemption and/or an award of sanctions against her. Years down the road, no monetary remedy is likely where the Trustee cannot surcharge Jacqueline's exemptions and where Jacqueline likely has been rendered destitute.

Without the intervention of the bankruptcy court, disaster

-27-

was, and is, imminent. It is unfortunate that the Trustee did not appeal sooner, either from the denial of the First Vexatious Litigant Motion or the denial of the Second Vexatious Litigant Motion, particularly in light of the Ninth Circuit's determination that Jacqueline's litigation of her dispute with the Probate Estate constituted an abuse of the bankruptcy process.

On the record before us, the bankruptcy court abused its discretion and clearly erred when it denied the Trustee's request, contained in the Standing Motion, for the imposition of a prefiling bar against Jacqueline.

## VI. CONCLUSION

In 2008, the Ninth Circuit determined that Jacqueline was abusing the bankruptcy process. Inexplicably, she has been shielded by the bankruptcy court and allowed to interfere with the Trustee's administration of the estate without restraint for more than five years since then. Despite the Trustee's multiple, desperate attempts to obtain the assistance of the bankruptcy court in curtailing Jacqueline's abusive behavior, she remains unchecked. The bankruptcy court's denial of the Trustee's most recent attempt, made through the Standing Motion, was an abuse of discretion. We VACATE the order on appeal and REMAND to the bankruptcy court for further proceedings on the Standing Motion. In particular, the bankruptcy court is instructed to make appropriate findings under DeLong and Safir in light of our analysis above and to implement an appropriate prefiling order to address the outrageous conduct of Jacqueline evidenced by the docket and her voluminous filings, that apparently will be

interminable unless she is restrained.